**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

US Salt, Inc.,

          Plaintiff,

                                      Civ. No. 07-1988 (RHK/JSM)
                                      **MEMORANDUM OPINION**
                                      **AND ORDER**

v.

Broken Arrow, Inc., *et al.*,

          Defendants.

---

Evon M. Spangler, Perry M. de Stefano, Spangler and de Stefano, PLLP, St. Paul, Minnesota, for Plaintiff.

Daniel N. Sacco, Wallace G. Hilke, Amy R. Mason, Lindquist & Vennum PLLP, Minneapolis, Minnesota, for Defendants.

---

**INTRODUCTION**

Plaintiff US Salt, Inc. ("US Salt") entered into a contract to buy salt from Defendant Broken Arrow, Inc. ("Broken Arrow") in June 2004 (the "Salt Contract"), agreeing to purchase a minimum of 15,000 tons of salt in a calendar year for the period of July 1, 2004 through December 31, 2007. At the end of August 2005, Broken Arrow stopped providing salt to US Salt. US Salt then commenced this action in Minnesota state court for breach of contract (Count 1), breach of express warranty (Count 2), breach of implied warranty of merchantability (Count 3), breach of implied warranty of fitness for a particular purpose (Count 4), breach of implied covenant of good faith and fair dealing (Count 5), and fraud (Count 6).

Broken Arrow removed the case to this Court and counterclaimed for breach of contract. Broken Arrow has now moved for summary judgment on all of US Salt's claims and US Salt has moved for partial summary judgment on its breach-of-contract claim. For the reasons set forth below, the Court will grant US Salt's Motion and grant Broken Arrow's Motion in part and deny it part.

## BACKGROUND

US Salt and Broken Arrow are both merchants who deal in salt products. (Compl. ¶¶ 6-7.) In 2003, US Salt was looking for a high quality source of washed-and-dried extra-course salt for water conditioners. (Johnson Aff. ¶ 4.) On October 27, 2003, Broken Arrow mailed a solicitation letter to US Salt, along with a sample of extra-course salt. (Compl. ¶ 8.) Broken Arrow indicated in the letter that it was "in the process of constructing salt washing and drying facilities" and "look[ed] forward to supplying [US Salt] a quality product in the coming years." (Johnson Aff. ¶ 5.) In the months prior to October 2003, Broken Arrow conducted a feasibility study on the construction of salt washing and kiln drying facilities. (Stephen Bunn Aff. ¶ 3.) In April 2004, Broken Arrow leased a facility to use for the kiln drying of salt and subsequently renovated this facility for that specific purpose. (Id. ¶ 5.) Broken Arrow also built a separate washing facility located at the salt ponds where it harvests salt. (Id. ¶ 6.)

The parties entered into the Salt Contract on June 1, 2004. (Compl. ¶ 11; Doc. No. 1, Ex. 1.) US Salt agreed to purchase a minimum of 15,000 tons of salt per calendar year for $20 per ton. (Doc. No. 1, Ex 1.) Four product data sheets were attached to, and referred to in, the Salt Contract, one for each size grade of salt: Extra Coarse, Coarse,

2

Medium, and Fine, in decreasing crystal size. (Id.) Each data sheet indicated that the salt would be "washed, dried, and screened producing a product suitable for the regeneration of water in water softener ion-exchange resins and for ice control." (Id.) The Salt Contract also contained a "Warranty" clause, which provided that the salt would meet the quality specifications listed in the product data sheets. (Id.)

In November 2004, Broken Arrow sent a shipment of salt to US Salt. (Compl. ¶ 17.) The shipment was nonconforming to the Salt Contract, however, because it was gray in color and was not washed. (Johnson Aff. Ex. C-1.) In January and February 2005, US Salt visited Broken Arrow's facilities in Utah to try to determine why this shipment did not conform to the product data sheets. (Compl. ¶¶ 19-20.)

On March 15, 2005, US Salt demanded that Broken Arrow cure the nonconforming shipment of salt. (Johnson Aff. Ex. C-3; Compl. ¶ 21). It also informed Broken Arrow that it was losing customers and incurring various expenses due to Broken Arrow's delay in providing conforming salt. (Id.) Broken Arrow responded by issuing US Salt a $22,889 credit for the nonconforming salt. (Mason Reply Aff. Ex. B at Interrogatory No. 8.)

From May 2005 to August 2005, Broken Arrow sent conforming salt to US Salt. At the end of August 2005, however, it stopped providing salt to US Salt. (Compl. ¶ 22.) In March and April 2006, US Salt requested assurances from Broken Arrow that it intended to honor the Salt Contract, but no assurances were provided. (Id.; Exs. C-2, D.) This action followed.

**STANDARD OF DECISION**

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**ANALYSIS**

US Salt has moved for partial summary judgment on its breach-of-contract claim. Broken Arrow seeks summary judgment on US Salt's claims for breach of contract (Count 1), breach of express warranty (Count 2), breach of implied warranty of merchantability (Count 3), breach of implied warranty of fitness for a particular purpose (Count 4), breach of implied covenant of good faith and fair dealing (Count 5), and fraud (Count 6).

**I.      Breach of Contract**

As a threshold matter, Broken Arrow argues that the Salt Contract is unenforceable because it (1) lacks a quantity term that it must sell and (2) fails to specify which grades of salt it must sell. US Salt asserts that the quantity term is clear and unambiguous.

This dispute is governed by Article 2 of the Minnesota Uniform Commercial Code because it involves the sale of goods between merchants. See Minn. Stat. §§ 336.2-104-105 (2007).[1] A contract for the sale of goods for a price of $500 or more is enforceable if it includes: (1) sufficient information to identify the parties and show that a contract for sale exists between them, (2) a quantity term, and (3) the signature of the party against whom enforcement is sought (or his or her authorized agent or broker). Id. § 336.2-201(1).

The Salt Contract meets these requirements – Broken Arrow agreed to sell and US Salt agreed to purchase dried sodium chloride solar salt for $20 per ton; there was a definite quantity term as US Salt agreed to purchase a minimum of 15,000 tons of salt in a calendar year; and it was in writing and signed by both parties.

Broken Arrow, however, argues that the Salt Contract is unenforceable because it only provides the quantity of salt that US Salt must buy, but it does not contain the quantity of salt that it must sell. This argument is without merit. There is nothing

---

[1] Both parties agree that Minnesota law governs the Salt Contract. See BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003) (law of forum state applies by default where parties do not raise choice-of-law issue).

5

indefinite or ambiguous about the quantity term in the Salt Contract. The determination of whether a contract is ambiguous is a question of law for the Court. Denelsbeck v. Wells Fargo & Co., 666 N.W.2d 339, 346-47 (Minn. 2003). Furthermore, contract provisions must be interpreted in the context of the entire contract, see Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp., 279 N.W.2d 349, 354 (Minn. 1979), and the effect of the language is not to be understood only from "isolated clauses." Boe v. Christlieb, 399 N.W.2d 131, 133 (Minn. Ct. App. 1987). The fact that the Salt Contract did not specifically state that Broken Arrow must sell a minimum of 15,000 tons of salt does not make the contract ambiguous or indefinite. The quantity term is clear as are the parties' obligations – US Salt agreed to purchase a minimum of 15,000 tons of salt, which means Broken Arrow agreed to sell a minimum of 15,000 tons of salt.

Broken Arrow also argues that the Salt Contract is unenforceable because it does not specify how much of each grade of salt US Salt is obligated to purchase and Broken Arrow is to sell. The Salt Contract identified and defined four different grades of salt: Extra Coarse, Coarse, Medium, and Fine. Broken Arrow argues that US Salt is required to purchase each grade of salt listed in the Salt Contract. (Stephen Bunn Aff. ¶ 8.) In particular, it asserts that it would lose money on every ton of salt that it processes unless US Salt takes all sizes, because it does not have a ready market for all of the smaller crystal sizes. (Id.) Prior to signing the Salt Contract, Broken Arrow claims that US Salt knew that it was required to purchase each grade of salt in the proportions in which they were produced in Broken Arrow's drying process. (Stephen Bunn Dep. at 93-96.)

6

Under the parol evidence rule, the "parties are barred from bringing evidence of any prior agreement or a contemporaneous oral agreement that contradicts the terms of a final, written contract." Minn. Stat. § 336.2-202. The parties, however, may bring "evidence of consistent additional terms" unless the court finds that the writing is intended by the parties to be a complete and exclusive statement of the terms of the agreement. Id. § 336.2-202(b). Whether an agreement is completely integrated and therefore not subject to variance by parol evidence is a question of law. Apple Valley Red-E-Mix v. Mills-Winfield Eng'g Sales, Inc., 436 N.W.2d 121, 123 (Minn. Ct. App. 1989). "A merger clause establishes that the parties intended the writing to be an integration of their agreement." Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn., 664 N.W.2d 303, 312 (Minn. 2003) (citation omitted).

Here, US Salt and Broken Arrow agreed that the Salt Contract "constitutes the entire agreement between the parties and there is no understanding . . . of any kind . . . not expressly set forth herein."[2] (Doc. No. 1, Ex 1). This is a clear indicator that the parties intended the Salt Contract to be a complete and final statement of the terms of their agreement. See Alpha, 664 N.W.2d at 313-14 (finding agreement to be completely integrated where merger clause specifically stated that it was the "entire agreement between the parties"); Karger v. Wangerin, 40 N.W.2d 846, 849 (Minn. 1950) ("what was said during the negotiations . . . must be understood to be superseded by the writing"). Furthermore, the alleged oral agreement requiring US Salt to purchase each

---

[2] The Salt Contract also prohibits the modification of its terms unless it is in writing and signed by the parties. (Doc. No. 1, Ex. 1.)

7

grade of salt in the proportions in which they were produced would directly contradict or vary the express terms of the Salt Contract.[3] The Salt Contract simply requires US Salt to purchase a minimum of 15,000 tons of salt in a calendar year at $20 per ton. This is not an ambiguous term that requires parol evidence for clarification because its meaning is clear on its face. Cooper v. Lakewood Eng'g & Mfg. Co., 874 F. Supp. 947, 953 (D. Minn. 1994) (citing Minnesota law) (explaining that if a contract term is determined to be unambiguous, its interpretation is a question of law). Accordingly, the Court determines that the Salt Contract represents the entire agreement between the parties and is a valid and enforceable contract.

The Court will now address whether Broken Arrow has breached the Salt Contract. The parties to a sales agreement have a right to performance and the assurance of performance. When reasonable grounds for insecurity arise, a party may demand, in writing, adequate assurance of due performance. Minn. Stat. § 336.2-609(1). The party seeking assurance may also suspend performance until receipt of such assurance. Id. Failure to seasonably provide such assurance results in a repudiation of the contract. Minn. Stat. § 336.2-609(4).

Broken Arrow stopped providing salt to US Salt at the end of August 2005. The record shows that US Salt requested assurances from Broken Arrow on March 8, 2006, as to whether it intended to honor the Salt Contract. (Johnson Aff. Ex. C-2.) US Salt informed Broken Arrow that it had "railcars waiting to be loaded, railcar leases, empty

---

[3] Indeed, such an obligation is certainly important enough that the parties would have included it in the Salt Contract if they had intended this.

8

bags, and other expenses associated with [the Salt Contract]." (Id.) The next month, US Salt again requested assurances from Broken Arrow that it intended to honor the Salt Contract. (Johnson Aff. Ex. D.) Broken Arrow, however, never provided any such assurances. As a result, Broken Arrow breached the Salt Contract when it stopped providing salt at the end of August 2005 and failed to provide any assurance that it would honor the Salt Contract. Broken Arrow argues that it was justified in doing so because US Salt breached the Salt Contract first by not purchasing each grade of salt. (Def.'s Reply Mem. at 10-11.) As discussed above, however, the Salt Contract does not require US Salt to purchase each grade of salt and Broken Arrow's attempt to alter the clear terms of the Salt Contract is barred by the parol evidence rule.

Accordingly, US Salt is entitled to summary judgment that Broken Arrow is liable for breach of contract. The issue of US Salt's damages, if any, is a question for the jury.

## II. Breach of Express and Implied Warranties

US Salt also asserts that Broken Arrow breached various warranties, including an express warranty in the Salt Contract, the implied warranty of merchantability, and the implied warranty of fitness for a particular purpose. Broken Arrow argues that it is entitled to summary judgment on these claims because it (1) cured the shipment of nonconforming salt when it issued US Salt a credit of $22,889 and (2) provided conforming salt from May 2005 through August 2005.

### A. Breach of Express Warranty

An express warranty is generally created when a seller specifically warrants that his product will satisfy certain specifications. A seller may create an express warranty

9

by: (1) making any affirmation of fact or promise that relates to the goods and becomes part of the basis of the bargain, (2) giving a description of the goods that becomes part of the basis of the bargain, or (3) showing the buyer a sample or model of the goods that the buyer reasonably assumes represents the characteristics of the goods he is to receive. Minn. Stat. § 336.2-313(a)-(c). "Whether an express warranty arises from the language and circumstances of a transaction is a question properly submitted to the jury." N. States Power Co. v. ITT Meyer Indus., 777 F.2d 405, 411 (8th Cir. 1985) (citing Heil v. Standard Chem. Mfg. Co., 223 N.W.2d 37, 41 (Minn. 1974)).

      Here, the Salt Contract provides that the salt would meet the quality specifications listed in the product data sheets. (Doc. No. 1, Ex 1.) The product data sheets provide that each grade of salt was to be "washed, dried, and screened producing a product suitable for the regeneration of water in water softener ion-exchange resins and for ice control." (Id.) Viewing the record in the light most favorable to US Salt, the Court concludes that a reasonable jury could conclude that Broken Arrow expressly warranted that the salt would meet the specifications in the product data sheets. The existence of an express warranty does not end the inquiry, however – the Court must also consider whether Broken Arrow has breached that express warranty.

      US Salt accepted the November 2004 shipment of salt, but asserts that it was nonconforming because it was unwashed, gray in color, and unsuitable for water conditioners. Although US Salt accepted the nonconforming salt (and later resold it), this does not prevent it from asserting other remedies it may have for the nonconformity. See Minn. Stat. § 336.2-714 ("Where the buyer has accepted goods and given notification . . .

10

the buyer may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."). The buyer must notify the seller within a reasonable time after it discovered or should have discovered a breach, or it is barred from any remedy. See Minn. Stat. § 336.2-607(3)(a).

Here, it is undisputed that US Salt immediately notified Broken Arrow that the November 2004 shipment of salt was nonconforming. Consequently, US Salt retained its right to a remedy for breach of express warranty. Broken Arrow claims that it cured the nonconforming salt when it issued a credit of $22,889 to US Salt. (Mason Reply Aff. Ex. B at Interrogatory No. 8.) This argument, however, goes to the amount of US Salt's damages (which is disputed by the parties) and not to whether Broken Arrow actually breached an express warranty. (Johnson Aff. Ex. C-3; Compl. ¶ 21). Accordingly, the Court will deny Broken Arrow's Motion on this claim.

### B.    Breach of Implied Warranties

A warranty of merchantability is implied in a contract for the sale of goods "[u]nless excluded or modified." Minn. Stat. § 336.2-314(1). For goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." Minn. Stat. § 336.2-314(2)(c). A warranty of fitness for a particular purpose is implied when a seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on [the] seller's skill or judgment to select or furnish suitable goods." Minn. Stat. § 336.2-315-16. This warranty is also implied "unless excluded or modified." Id.

11

Here, Broken Arrow did not properly disclaim the implied warranty of merchantability. To exclude or modify this implied warranty, a contract's language must specifically mention merchantability and if the disclaimer is in writing it must be conspicuous. See Minn. Stat. § 336.2-316(2); Soo Line R.R. Co. v. Fruehauf Corp., 547 F.2d 1365, 1373 n.13 (8th Cir. 1977) (applying Minnesota law) ("the need for contractual certainty dictates against abandoning the requirement for a disclaimer to mention the word 'merchantability'"). The disclaimer in the Salt Contract states that "there is no understanding, representation, or warranty of any kind expressed or implied, not expressly set forth herein." (Doc. No. 1, Ex 1.) Although the disclaimer in the Salt Contract is conspicuous,[4] it did not mention "merchantability."[5] Therefore, the implied warranty of merchantability is applicable and the Court will deny Broken Arrow's Motion for summary judgment on this claim.

However, the Court determines that Broken Arrow did properly disclaim the implied warranty of fitness for a particular purpose. To exclude or modify this implied warranty, the disclaimer must be in writing and must be conspicuous. See Minn. Stat. § 336.2-316(2). Notably, "[l]anguage to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'" Id. The disclaimer in the Salt Contract has a clause

---

[4] "Courts have considered capitalization, typeface, contrasting color, and location of the clause in determining whether it is conspicuous." Agristor Leasing v. Guggisberg, 617 F. Supp. 902, 909 (D. Minn. 1985) (applying Minnesota law). Here, the disclaimer was in capital letters and above the signature lines of the Salt Contract.

[5] The implied warranty of merchantability may also be disclaimed by expressions like "as is" or "with all faults." Minn. Stat. § 336.2-316(3)(a). But, Broken Arrow did not use any of these expressions in the disclaimer.

containing such language: "there is no . . . warranty of any kind expressed or implied, not expressly set forth herein." (Doc. No. 1, Ex. 1.) Therefore, the Court will grant Broken Arrow's Motion with respect to US Salt's claim for breach of the implied warranty of fitness for a particular purpose.

**III.    Fraud Claim**

Broken Arrow next argues that it is entitled to summary judgment on US Salt's fraud claim because US Salt cannot establish the necessary elements of such a claim. The Court agrees. US Salt's fraud claim is based on a statement contained in an October 27, 2003 solicitation letter, in which Broken Arrow stated that it was in "the process of constructing salt washing and drying facilities." (Compl. ¶ 60.) US Salt asserts that it relied on this false statement when it entered into the Salt Contract.

To prevail on its fraud claim, US Salt must show that: (1) Broken Arrow made a false representation of a past or present material fact that is susceptible to knowledge; (2) Broken Arrow either knew the representation was false or asserted it as true without knowing whether it was true or false; (3) Broken Arrow intended to induce US Salt to act on the false representation; (4) US Salt did, in fact, act in justifiable reliance on the false representation; and (5) US Salt suffered damages as a proximate cause of the misrepresentation. Martens v. Minn. Mining & Mfg., 616 N.W.2d 732, 747 (Minn. 2000).

Here, US Salt takes issue with the assertion that Broken Arrow had merely conducted a feasibility study on the construction of salt washing and drying facilities, as opposed to already being in the process of constructing such facilities. The evidence

13

shows that Broken Arrow ultimately decided to lease, not construct, the facilities. As such, US Salt argues that there is a genuine issue of material fact as to whether Broken Arrow was actually in the process of constructing salt washing and drying facilities as of October 27, 2003.

US Salt, however, fails to address how this alleged misrepresentation is material. The record shows that US Salt was fully aware of the status of such facilities. (Mason Reply Aff. Ex. F.) Indeed, in November 2003 and April 2004, US Salt toured Broken Arrow's salt piles and facilities in Utah. (Id. Ex. B.) US Salt also took pictures of Broken Arrow's facilities and observed that they were not operational. (Id.) On June 1, 2004, US Salt entered into the Salt Contract with Broken Arrow. Notably, the Salt Contract itself indicates that the salt "[p]roducts are anticipated to be available by July 2004." (Doc. No. 1, Ex. 1.) Thus, US Salt was fully aware that the salt washing and drying facilities were not yet complete as of June 1, 2004.

Even if Broken Arrow falsely represented to US Salt that it was currently in the process of constructing salt washing and drying facilities as of October 27, 2003, there is no evidence to show that this was a material misrepresentation; thus, US Salt's fraud claim fails as a matter of law. Furthermore, US Salt could not have reasonably relied on this single vague statement as its basis for entering into the Salt Contract when it was well aware of the status of Broken Arrow's facilities. Accordingly, the Court will grant Broken Arrow's Motion on US Salt's fraud claim.

## IV.     Implied Covenant of Good Faith and Fair Dealing Claim

Finally, US Salt asserts that Broken Arrow violated the implied covenant of good faith and fair dealing.[6]  Broken Arrow, however, argues that US Salt has simply repeated its arguments that Broken Arrow breached the Salt Contract.  The Court agrees.

Minnesota law recognizes an implied covenant of good faith and fair dealing in every contract.  In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn. 1995).  Minnesota law, however, does not recognize a separate cause of action for breach of the implied covenant of good faith when it arises from the same conduct as a breach-of-contract claim.  See Medtronic, Inc. v. ConvaCare, Inc., 17 F.3d 252, 256 (8th Cir. 1994) ("Minnesota law does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing separate from the underlying breach of contract claim."); Orthomet, Inc. v. A.B. Med., Inc., 990 F.2d 387, 392 (8th Cir. 1993) ("a cause of action for good faith and fair dealing cannot exist independent of the underlying breach of contract claim.").

Here, US Salt bases its breach-of-implied-covenant claim on the same conduct as its breach-of-contract claim – Broken Arrow's failure to provide salt pursuant to the terms of the Salt Contract.  Accordingly, the Court will grant Broken Arrow's Motion as to this claim.

---

[6] At the hearing on December 19, 2007, US Salt orally cross-moved for partial summary judgment on this claim.  That request is **DENIED** for the reasons set forth below.

**CONCLUSION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED**:

1. US Salt's Motion for Partial Summary Judgment (Doc. No. 37) on its breach-of-contract claim as to liability (Count 1) is **GRANTED**. US Salt's Motion for dismissal of Broken Arrow's Counterclaim for breach of contract (Doc. No. 9) is **GRANTED** and the Counterclaim is **DISMISSED WITH PREJUDICE**; and

2. Broken Arrow's Motion for Summary Judgment (Doc. No. 27 ) is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a. **GRANTED** as to US Salt's claims for breach of implied warranty of fitness for a particular purpose (Count 4), breach of implied covenant of good faith and fair dealing (Count 5), and fraud (Count 6), and Counts 4, 5, and 6 of US Salt's Complaint are **DISMISSED WITH PREJUDICE**; and

   b. **DENIED** with respect to US Salt's claims for breach of contract (Count 1), breach of express warranty (Count 2), and breach of implied warranty of merchantability (Count 3).

Dated: February 11, 2008                              s/Richard H. Kyle
                                                      RICHARD H. KYLE
                                                      United States District Judge